IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GRAMERCY ASSET MANAGEMENT LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>RICHARD E. PERLMAN and RP CAPITAL PARTNERS, LLC<br><br>*Defendants.* | Case No. <br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Gramercy Asset Management LLC ("GAM"), by and through its attorneys, O'Shea Partners LLP, for its Complaint, alleges as follows:

### NATURE OF THE ACTION

1. Defendant Richard E. Perlman ("Perlman") is a multi-millionaire who engaged in tax shelter transactions in 2003 with the aim of avoiding over $4 million in taxes on approximately $12 million in income. In connection with his shelter, Perlman retained GAM, an affiliate of Gramercy Advisors, LLC ("Gramercy"), for the limited purpose of sourcing certain assets and executing certain transactions requested by him and his investment advisors. Both before and after engaging in these transactions, Perlman contractually agreed to indemnify and save GAM harmless from and against any and all claims arising out of his relationship with GAM and its affiliates, including but not limited to, any matter related to taxation.

2. Later, after Perlman had already been notified that the Internal Revenue Service ("IRS") was auditing his tax return for 2003 and at a time when numerous other frivolous publicly-available lawsuits had been filed against Gramercy and its affiliates by disgruntled tax

shelter participants, Perlman entered into two additional agreements releasing his claims against GAM.

3. Perlman's tax shelter was ultimately rejected by the IRS in 2011. Thereafter, Perlman brought suit against GAM in Illinois seeking to make it the unwilling insurer of his inherently risky tax investment despite the numerous releases and disclaimers he had signed absolving Gramercy, GAM, and their affiliates of all liability.

4. GAM brings this lawsuit to recover, among other things, the damages it has incurred defending itself from Defendants' meritless strike suit and for advancement and indemnification.

## PARTIES

5. Plaintiff GAM is a limited liability company whose sole member is GAM Holdings Inc, a Connecticut Corporation with a principal place of business of 20 Dayton Avenue, First Floor, Greenwich, CT 06830.

6. Defendant Perlman is a domiciliary of the State of New York.

7. Defendant RP Capital Partners, LLC ("RP Capital") is a limited liability company whose sole member is Defendant Perlman. RP Capital was formally known as Bekoz LLC ("Bekoz").

## JURISDICTION AND VENUE

8. There is complete diversity between the parties, and the amount in controversy is in excess of $75,000, exclusive of interest and costs. Therefore, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1367.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants are residents of New York, New York and a substantial part of the events or

omissions giving rise to the claims in this lawsuit occurred within this District. Additionally, Defendants have contractually consented to venue in this District.

10. This Court has personal jurisdiction over the Defendants. As set forth more fully herein, Defendants are residents of New York, New York, committed acts giving rise to personal jurisdiction in New York, and consented to jurisdiction in this District.

## COMMON ALLEGATIONS

### A. Perlman Seeks out GAM to Facilitate Tax Shelters Designed by his Independent Advisors.

11. Perlman is an ultra-high net worth resident of New York City. In 2003, Perlman sold his interest in PracticeWorks, Inc. Seeking to avoid over $4 million in taxes on approximately $12 million in income, Perlman consulted with two non-parties – the accounting and consultancy firm of BDO Seidman LLP ("BDO") and the law firm of Kilpatrick Stockton LLP – to devise a tax-avoidance strategy. The tax-avoidance strategy involved the purchase and sale of distressed emerging market debt with high cost basis and low market value to generate a capital loss that could then be used to offset Perlman's substantial income.

12. As part of the strategy, Perlman retained GAM to source certain distressed debt assets and to execute transactions according to the instructions of BDO and Kilpatrick Stockton LLP. Perlman requested that GAM execute certain transactions on his behalf pursuant to his tax strategy after consultation with his independent team of financial and legal advisors. Many of these transactions were executed through financial exchanges located in New York City and with counterparties based in New York City. At no time did GAM provide Perlman with advice concerning the tax aspects of the strategy and, as set forth below, Perlman represented in writing on multiple occasions that GAM had not provided him with tax advice.

### B. GAM and Perlman Memorialize the Terms of Their Relationship in Writing.

13. The terms of the relationship between Perlman and GAM were set forth in an Investment Management Agreement ("IMA") executed by GAM and Perlman as of September 23, 2003. (*See* Exhibit A.) Pursuant to the IMA, GAM purchased and sold certain financial instruments on Perlman's behalf and at his request.

14. The IMA made clear that GAM was neither willing nor able to provide Perlman with any advice or guidance of any kind on tax matters or tax strategy. The IMA further made clear that GAM was unwilling to accept Perlman as an investor unless and until he agreed to hold GAM and its affiliates harmless from any and all liability related to his investments and transactions.

Specifically, in Paragraph 7(c) of the IMA, Perlman agreed:

> [GAM] is *not required to inquire into or take into account the effect of any tax laws or the tax position of [Perlman]* in connection with managing the Account. To the fullest extent permitted by law, *neither [GAM], its members nor any of their respective affiliates* and their respective partners, members, officers, directors, employees, shareholders and agents *shall be liable in any manner to [Perlman] with respect to the effect of any* U.S. Federal, state, local or any other *taxes of any nature whatsoever* on the Account or [Perlman] in connection with managing the Account or in connection with this Agreement or otherwise. *[Perlman] represents and agrees* that [he] has consulted [his] own tax advisor, and *that neither [GAM] nor any of its affiliates has made any oral or written statement to [Perlman], regarding the possible tax consequences* of establishing the Account or entering into any investment made under or in connection with this Agreement. [Perlman] further *represents and agrees that it has not relied on [GAM] or any of its affiliates in connection with any tax advice* . . . In addition, to the fullest extent permitted by law, neither [GAM], its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents shall have any personal liability to [Perlman], or [his] partners, officers, directors, employees, shareholders or agents, by reason of any change in U.S. federal, state or local or foreign income tax

4

        laws, or in interpretations thereof, as they apply to [Perlman], whether the change occurs through executive, legislative, judicial or administrative action.

(*Id.*) (emphasis added.)

    15. The IMA also made clear that GAM's role with regard to Perlman's chosen tax strategy was limited, and that GAM's liability was therefore restricted. Paragraph 2 of the IMA gave GAM the right to "take into account any strategies or suggestions made from time to time…by the Client, or by any of its professional advisors (i.e. accountants or legal counsel) . . . [i.e., Perlman's tax strategy]." (*Id.* ¶ 2.) With regard to those "strategies or suggestions," Perlman agreed that GAM would "not be liable . . . [for] any act or omission by [GAM] based on the suggestions of any professional advisor of the Client." (*Id.* ¶ 7(b).) All of the actions taken by GAM with regard to Perlman's tax transactions were solely done at the direction of Perlman and/or his independent advisors.

    16. Perlman also agreed to indemnify GAM and to advance funds to it to cover expenses (including attorney's fees) incurred in defense or settlement of any claim arising out of or in connection with GAM's management of his accounts.

    17. In Paragraph 7(e) of the IMA, Perlman agreed that

> *[t]o the fullest extent permitted by law, [Perlman] shall indemnify and save harmless [GAM], its members and any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents* (including parties acting as agents for the execution of transactions) (the "Indemnitees") *from and against any and all claims, liabilities, damages, losses, costs and expenses*, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses *of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of [Perlman], managing the Account, any investment made under or in connection with this Agreement, or*

> *the performance by the Indemnitee of the [GAM's] responsibilities hereunder....*

(*Id.*) (emphasis added.)

18. In Paragraph 7(f), Perlman further agreed to advance any money he owed to an indemnitee prior to the disposition of the claims:

> ***Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by [Perlman] prior to the final disposition*** thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

(*Id.*)) (emphasis added.)

19. Therefore, it is clear that Indemnification running from Perlman to GAM was intended pursuant to the IMA, including indemnification for any suits brought by Perlman against GAM. This is confirmed by, *inter alia*, the fact that the indemnification provisions contained in the IMA explicitly state that Perlman shall indemnify GAM from and against "any claim or alleged claim, of any nature whatsoever" arising in connection with GAM's performance pursuant to the IMA and "[t]o the fullest extent permitted by law." Accordingly, it is apparent from the language and purpose of the IMA that Perlman is obligated to indemnify GAM for losses incurred in connection with Defendants' lawsuit against GAM.

20. The IMA contains a New York choice of law clause. (See *Id.* ¶ 14(d).)

21. In addition to the IMA, on September 23, 2003, Perlman also executed a letter (the "Belief Letter") addressed to GAM stating the following:

> In connection with the execution of the Investment Management Agreement (the "Agreement") between Richard E. Perlman and Gramercy Asset Management LLC (the "Investment Manager"), the undersigned hereby represents and warrants to you that the investments made pursuant to the Agreement and all transactions

6

> related thereto (collectively, the "Transactions") are believed to be in accordance with all the laws, rules and regulations applicable to the undersigned.

(See Exhibit B.)

22. In the Belief Letter Perlman also made numerous representations to GAM concerning tax related matters, as follows:

> The undersigned further represents and acknowledges that: (a) *undersigned has consulted with [his] own financial, tax and legal advisors with respect to the Transactions and, in particular, the effect of the tax laws and regulations and the impact of any notices or announcements issued by the IRS*, (b)... *undersigned has not relied*, and will not rely, *on [GAM] for any financial, tax or legal advice* with respect to the Transactions, and (c) *undersigned shall not have any claim against [GAM] in the event that any tax liability, problem or issue should arise in connection with the Transactions other than as a direct result of any negligence of [GAM] in effecting the investments pursuant to the Agreement.*

(*Id.*) (emphasis added.)

23. Pursuant to the transactions designed by Perlman and his advisors, on September 26, 2003, GAM organized Bekoz (which later became RP Capital).

24. On October 13, 2003, Perlman purchased a 89.01% interest in Bekoz and entered into an Amended and Restated Operating Agreement in which he was named President, Chairman, and Sole Manager of the company. (*See* Exhibit C § 1.38, Sch. A.) Bekoz did not have any have any purpose aside from facilitating the tax-avoidance aims of Perlman and was the alter-ego of Perlman.

25. On the same day, Perlman, on behalf of Bekoz, and GAM executed an operating agreement which formed Beyazit LLC ("Beyazit") (the "Beyazit Operating Agreement"). The Beyazit Operating Agreement named Bekoz and GAM as the two members of Beyazit (Bekoz and GAM had 98.90% and 1.10% interests in the company, respectively) and named GAM Sole

7

Manager of Beyazit. (*See* Exhibit D § 1.39, Sch. A.) Beyazit was formed for the sole purpose of facilitating Perlman's tax transactions.

      26.      By entering into the Beyazit Operating Agreement, Perlman agreed that GAM had no liability to Bekoz for any loss or damages caused by GAM's performance of services under the agreement:

> ***Neither the Sole Manager nor any of its Affiliates nor any of their respective officers, directors, members, employees, managers or agents shall be liable to the Company or to any of its Members for any loss or damage occasioned by any acts or omissions in the performance of its services under this Agreement***, unless such loss or damage is due to the gross negligence, recklessness or willful misconduct of, or violations of applicable securities laws…by the Sole Manager or such officer or agent, or as otherwise required by law.

(*See Id.* § 4.3(a)(i).)

      27.      The Beyazit Operating Agreement further stated that GAM did not provide any advice or guidance of any kind on tax matters and that GAM would not be liable to Bekoz in the event of any tax liability:

> ***Each Member agrees and represents that neither the Company nor the Sole Manager nor their Affiliates*** nor any of their respective officers, directors, members, managers or employees has ***made any written or oral statement to such Member as to the potential tax consequences of, and such Member has not relied on the Company, the Sole Manager, their Affiliates or any of their respective officers, directors, members, managers or employees for tax advic***e in connection with, such Member's investment in the Company. ***The Sole Manager shall not be liable to the Company or any Member in the event of any tax liability, problem, investigation, audit or issue that may arise in connection with the investment in the Company by any Member and all transactions related in any way to such investment***, other than as a result of the gross negligence of the Sole Manager in effecting any investment transaction.

(*See Id.* § 4.3(a)(v).)

28. Defendants also entered into two contribution agreements with GAM, in connection with the IMA, later in 2003. (See Exhibits E-F.) Pursuant to these agreements, various transactions that were also the subject of the IMA and the Belief Letter were effectuated. Paragraph 3(d) of the Contribution Agreements provides in relevant part:

> This Agreement shall be governed by the internal laws of the State of New York. The Parties submit to and accept the nonexclusive jurisdiction of any court of appropriate jurisdiction of the State of New York and the United States of America located in New York City, New York, with respect to any action, suit, or proceeding arising out of or based upon this Agreement or any matter relating hereto. Each party waives any objections that it may have to the laying of venue in any such court.

This action is "related to" the transactions that are the subject of the Contribution Agreements. Accordingly, Defendants have consented to jurisdiction in this district.

### C. Perlman Signs Additional Agreements Releasing All Claims Against GAM.

29. In 2004, Perlman filed his 2003 tax return, which included a deduction for his claimed loss of approximately $12 Million.

30. Perlman signed a Standard Redemption Request (the "Redemption Request"), dated March 31, 2008, in which he confirmed the terms of the IMA, Belief Letter, and the Beyazit Operating Agreement and affirmed that he did not receive any tax advice from GAM, Gramercy, or any of their affiliates and did not have any claims against them. The Redemption Request states:

> I hereby confirm the terms of the Beyazit LLC Operating Agreement dated October 13, 2003 and my related Investment Management Agreement and all other agreements executed by me in relation to my investments in the Bekoz LLC and Beyazit LLC partnerships, including my Interest Purchase Agreement, my Contribution Agreement and my letter to [GAM] dated September 23, 2003. I further confirm that *I have neither received nor relied upon Gramercy, or any of its affiliates for any legal or tax advice. I agree that I shall not have any claim against Gramercy or its*

9

> *affiliates in relation to any investments managed or previously managed by such parties*, other than as a direct result of any gross negligence by such parties in effecting such investments.

(*See* Exhibit G.)

31.   On April 30, 2011, Perlman, on behalf of both himself and RP Capital (formerly Bekoz), entered into a Membership Interest Redemption Agreement (the "Redemption Agreement") with GAM in which he unconditionally released all claims against GAM and its affiliates other than claims for breaches of the Redemption Agreement; agreed not to bring those claims; and agreed to indemnify GAM and its affiliates if he violated the agreement to release those claims. On behalf of himself and RP Capital, he pledged to:

> *[F]orever and irrevocably waiv[e] and releas[e] any and all claims, damages, rights and causes of action of any kind, whether known or unknown*, contingent or absolute, suspected or unsuspected, disclosed or undisclosed, matured or unmatured, at law or equity or otherwise, from the beginning of time through the date hereof, *that such party currently has or may have against any other party to this Agreement* (or has or may have against any current or former affiliate, owner or employee of such other party to this Agreement) other than with respect to claims for breaches of this Agreement. *Each party to this Agreement agrees not to commence a lawsuit or arbitration proceeding or otherwise pursue or permit to be pursued on its behalf, any claim, cause of action or suit based on any of the claims, damages, rights or causes of action released above.* In the event that a party to this Agreement commences a lawsuit or arbitration proceeding, or pursues or otherwise permits the assertion on its behalf of a claim, suit or cause of action in violation of this paragraph, such party commencing the lawsuit or arbitration proceeding, or pursuing or permitting the assertion if such claim, suit or cause of action *shall be liable and shall fully indemnify the other party to this agreement in opposition to such lawsuit, arbitration proceeding, claim, suit or cause of action…for all attorney's fees and costs incurred by such other party to this Agreement…in connection with such lawsuit*, arbitration proceeding, claim, suit or cause of action.

(*See* Exhibit H § 9 (emphasis added).)

32. The Redemption Agreement also contains a New York choice-of-law clause. (*Id.* § 19.)

33. Upon the execution of the Redemption Agreement, Perlman became the sole member of RP Capital.

34. Perlman received notice in 2006 — *before* he executed the Redemption Request or the Redemption Agreement — that the IRS was opening an administrative proceeding concerning his 2003 tax return. Furthermore, four publicly-available (and frivolous) lawsuits had been filed against Gramercy and its affiliates by disgruntled tax shelter participants before Perlman executed either agreement. *See Kenneth R. Thompson et al. v. BDO Seidman, LLP, et al.*, Docket No. 05-CA-1041-16-L (Cir. Ct. Seminole Co. FL) (filed May 20, 2005); *Michael Hartley, et al. v. KPMG, LLP, et al.*, Docket No. BC353756 (Super. Ct. Los. Ang. Co. CA) (June 13, 2006); *John A. Jones, et al. v. BDO Seidman, LLP, et al.*, Docket No. 3:06-cv-01115 (M.D. Tenn.) (filed Nov. 20, 2006); *William H. Black, Jr. v. Gramercy Advisors LLC, et al.*, Docket No. Civ.A. 2733-VCL (Del. Ct. Chancery) (filed Feb. 12, 2007).

35. Between the time that Perlman executed the Redemption Request in 2008 and the Redemption Agreement in 2011, tax shelter participants filed numerous additional publicly-available (and frivolous) suits against Gramercy and its affiliates. *See R. K. Lowry, Jr., et al. v. BDO Seidman, LLP, et al.*, Docket No. 2008-74262 (Harris Co. Dist. Ct. TX) (Filed Dec. 17, 2008); *Robert Ripley, et al. v. BDO Seidman, LLP, et al.*, Docket No. 09-LA-000001 (Cir. Ct. McHenry Co. IL) (January 2, 2009); *Glen Nussdorf, et al. v. BDO Seidman, LLP, et al.*, Docket No. 09-601359 (Sup. Ct. New York Co. NY) (filed May 4, 2009); *J.A. Green Development Corp., et al. v. BDO Seidman, LLP, et al.*, Docket No. 09-07682 (Dallas Co. Dist. Ct. TX) (June 17, 2009); *Shahid R. Khan v. BDO Seidman, LLP, et al.*, Case No. 09-L-139 (Cir. Ct. Champaign

Co. IL) (filed July 6, 2009); *Shahid R. Khan v. BDO Seidman, LLP, et al.*, Case No. 09-L-140 (Cir. Ct. Champaign Co. IL) (filed July 6, 2009); *SSW Holding Co., et al. v. BDO Seidman, LLP, et al.*, Docket No. CV-2009-1332(V) (Sebastian Co. Dist. Ct. AR) (filed July 10, 2009).

36. Therefore, at the time that Perlman agreed to release his claims, there was no doubt that he knew it was likely the IRS would disallow the losses he claimed on his 2003 tax return and that similarly situated individuals had (mistakenly and frivolously) alleged that Gramercy was responsible for their tax penalties.

### D. After the IRS Rejects his Tax Shelter, Perlman Files Suit Against GAM in Illinois in Violation of Numerous Agreements.

37. In 2011, the IRS issued its final determination that rejected Perlman's tax strategy and disallowed the claimed losses associated with it.

38. Although RP Capital/Bekoz and Beyazit engaged in the tax shelter transactions, upon information and belief, they do not actually pay any income taxes of their own. Therefore, upon information and belief, any tax losses were allocated to Perlman individually (making it Perlman's responsibility to pay any tax penalties) and Perlman personally paid any penalties, fines, and fees and expenses owed as a result of the tax-avoidance strategy.

39. On April 1, 2014, Defendants filed suit against, *inter alia*, GAM in the Circuit Court of Cook County, Illinois asserting claims in direct violation of the IMA, the Belief Letter, the Beyazit Operating Agreement, the Redemption Request, and the Redemption Agreement, resulting in GAM's causes of action herein for damages, advancement, and indemnification.

40. This lawsuit was brought in bad faith and obvious breach of the releases, disclaimers, and the covenants not to sue contained in the IMA, the Belief Letter, the Beyazit Operating Agreement, the Redemption Request, and the Redemption Agreement. The lawsuit is captioned *Perlman, et al. v. BDO USA, L.L.P., et al.*, Cause No. 2014 L 2858.

41. GAM was not served in the action until it agreed to accept service of Defendants' Second Amended Complaint on August 5, 2014. A copy of the Second Amended Complaint filed in the Lawsuit is attached as Exhibit I.

42. On January 21, 2015, GAM transmitted a letter to Perlman seeking, by January 26, 2015, advancement of $250,000 to cover legal fees and costs anticipated to be incurred in connection with Defendants' Illinois lawsuit (and expressly undertaking to repay any amounts advanced to the extent that it shall be determined ultimately that GAM is not entitled to be indemnified under the IMA). Defendants refused GAM's request.

43. On account of the valid and enforceable contracts requiring Defendants to hold GAM harmless and refrain from bringing suit against GAM, and the repeated written acknowledgments that GAM provided no tax advice to Defendants and would have no liability for transactions suggested by Perlman and/or his advisors, GAM seeks an order directing Perlman to advance to GAM any future costs associated with the Lawsuit, and to indemnify GAM from any past, present, or future costs, fees, or expenses connected with the Lawsuit. Defendants are also liable for damages suffered by GAM as a result of Defendants' violations of their agreements with GAM.

## FIRST CAUSE OF ACTION
### Breach of Contract (Investment Management Agreement)

44. Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 43 as if set forth fully herein.

45. On September 23, 2003, Perlman entered into the IMA with GAM.

46. The IMA contained numerous provisions in which Perlman agreed to indemnify, release, and hold GAM harmless for any and all claims concerning GAM's work on behalf of

Perlman to the fullest extent permitted by law, including but not limited to work performed in connection with Perlman's tax strategy.

47. In the IMA, Perlman also agreed to advance funds to GAM to cover expenses (including attorney's fees) incurred in defense or settlement of any claim arising out of or in connection with GAM's management of Perlman's account and to indemnify and save GAM harmless from and against all claims arising out of his relationship with GAM and its affiliates.

48. GAM has dutifully performed all of its contractual obligations to Perlman arising under the IMA.

49. In an obvious and bad faith breach of the covenant not to sue contained in the IMA, Perlman filed a complaint against GAM in Illinois state court on April 1, 2014.

50. In further breach of the IMA, to date Perlman has refused to indemnify or advance funds requested by GAM as reimbursement for amounts expended to date and to be used in the future to defend against Defendants' lawsuit against GAM.

51. As a result of Perlman's breaches of the IMA, GAM has suffered and is entitled to damages in the amount of, among other things, its legal fees to date, and advancement of future legal fees, along with additional damages to be determined at trial.

## SECOND CAUSE OF ACTION
### Breach of Contract (Belief Letter)

52. Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 51 as if set forth fully herein.

53. As set forth above, Perlman executed a Belief Letter dated September 23, 2003 in connection with the transactions GAM executed at Perlman and his advisors' behest.

54. The Belief Letter promised that Perlman would not assert claims against GAM related to any tax liability incurred by Perlman arising in connection with his tax strategy.

55. Additionally, in the Belief Letter, Perlman represented and warranted that he believed that all the transactions related to the IMA were in accordance with all applicable laws, rules, and regulations.

56. GAM relied on the representations and warranties in the Belief Letter in executing transactions on behalf of Perlman.

57. GAM has dutifully performed all of its contractual obligations to Perlman arising under the Belief Letter and IMA.

58. Perlman has brought suit against GAM in breach of the Belief Letter he executed.

59. As a result of that breach, GAM has suffered and is entitled to damages in the amount of, among other things, its legal fees and costs to date along with additional damages to be determined at trial.

60. Perlman further breached the Belief Letter because his transactions and tax avoidance strategy were deemed unlawful by the IRS.

61. Due to its reliance on Perlman's representations and warranties that all of his transactions were lawful, GAM has suffered in the form of reputational damage and legal fees.

### THIRD CAUSE OF ACTION
### Breach of Contract (Beyazit Operating Agreement)

62. Plaintiff restates and realleges the allegations set forth in Paragraphs 1 to 61 as if set forth fully herein

63. As set forth above, on October 13, 2003, Bekoz (later known as RP Capital) entered into the Beyazit Operating Agreement with GAM. Perlman executed the agreement on behalf of Bekoz. The sole purpose of Beyazit and Bekoz/RP Capital was to execute the tax strategy formulated by Perlman and his advisors.

64. By executing the Beyazit Operating Agreement, Perlman confirmed that GAM did not provide any tax advice, Bekoz did not rely on GAM for any such advice, and that GAM was not liable to Bekoz for any damages occasioned by acts performed under that agreement, including any tax liability.

65. GAM has dutifully performed all of its contractual obligations to Defendants arising under the Beyazit Operating Agreement.

66. Defendants have in fact brought suit against GAM in violation of the Beyazit Operating Agreement, causing GAM to incur substantial costs.

67. As a result, Defendants are in breach of the Beyazit Operating Agreement.

68. As a result of the breach, GAM has suffered and is entitled to damages in the amount of, among other things, its legal fees and costs to date along with additional damages to be determined at trial.

## FOURTH CAUSE OF ACTION
### Breach of Contract (Redemption Request)

69. Plaintiff restates and realleges the allegations set forth in Paragraphs 1 to 68 as if set forth fully herein.

70. As set forth above, Perlman executed a Redemption Request dated March 31, 2008 in connection with the transactions GAM executed at Perlman and his advisors' behest.

71. By executing the Redemption Request, Perlman confirmed that Defendants never relied on GAM for any legal or tax advice and agreed that Defendants did not have any claims against GAM based on any investment managed by GAM.

72. GAM has dutifully performed all of its contractual obligations to Defendants arising under the Redemption Request.

73. Defendants have in fact brought suit against GAM in violation of the Redemption Request, causing GAM to incur substantial costs.

74. As a result, Defendants are in breach of the Redemption Request.

75. As a result of the breach, GAM has suffered and is entitled to damages in the amount of, among other things, its legal fees and costs to date along with additional damages to be determined at trial.

### FIFTH CAUSE OF ACTION
### Breach of Contract (Redemption Agreement)

76. Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 75 as if set forth fully herein.

77. As set forth above, on April 30, 2011, Defendants entered into the Redemption Agreement with GAM in connection with the transactions GAM executed at Perlman and his advisors' behest.

78. By executing the Redemption Agreement, Defendants agreed to release all claims against GAM (other than claims for breaches of the Redemption Agreement itself), not to pursue such claims against GAM, and to indemnify GAM if they asserted such claims.

79. GAM has dutifully performed all of its contractual obligations to Defendants arising under the Redemption Agreement.

80. Defendants have in fact brought suit against GAM in violation of the Redemption Agreement, causing GAM to incur substantial costs.

81. As a result, Defendants are in breach of the Redemption Agreement.

82. In further breach of the Redemption Agreement, to date Defendants have refused to indemnify GAM for amounts expended to date to defend against Defendants' lawsuit against GAM.

83. As a result of the breaches, GAM has suffered and is entitled to damages in the amount of, among other things, its legal fees and costs to date along with additional damages to be determined at trial.

### SIXTH CAUSE OF ACTION
### Declaratory Judgment

84. Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 83 as if set forth fully herein.

85. An actual, substantial, immediate, and real controversy exists between the parties regarding Defendants' ongoing contractual obligations to refrain from initiating litigation against GAM arising out of their relationship with GAM and its affiliates; to advance expenses to GAM; and to indemnify GAM pursuant to the provisions of the IMA, the Belief Letter, the Beyazit Operating Agreement, the Redemption Request, and the Redemption Agreement.

86. Plaintiffs seek a declaration that Defendants have an existing and ongoing obligation to refrain from initiating litigation against GAM; to advance expenses incurred by GAM; and to fully indemnify GAM for its expenses. Plaintiffs also seek an order directing Defendants to withdraw their Illinois lawsuit and directing Defendants to advance fees and indemnify GAM.

### SEVENTH CAUSE OF ACTION
### Specific Performance

87. Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 86 as if set forth fully herein.

88. Valid and enforceable contracts for good and valuable consideration in the form of the IMA, the Belief Letter, the Beyazit Operating Agreement, the Redemption Request, and the Redemption Agreement exist between the parties for investment services as aforesaid.

89. GAM has dutifully performed all of its contractual obligations to Defendants arising under the foregoing contracts.

90. Upon information and belief, Defendants are able to perform their obligations under the contracts, specifically, by withdrawing their lawsuit against GAM; advancing legal fees to GAM; and indemnifying GAM pursuant to the indemnification provisions of the contracts.

91. The refusal of Defendants to perform their contractual obligations requires in right justice and equity the intervention of this Court to order specific performance to the extent that there is no adequate remedy at law for any or all of the relief sought by GAM.

## EIGHTH CAUSE OF ACTION
### Promissory Estoppel

92. Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 91 as if set forth fully herein.

93. Defendants made clear and unambiguous promises to GAM as aforesaid.

94. GAM relied on those promises, and that reliance was foreseeable by Defendants.

95. GAM suffered injury in reliance upon the promises of Defendants as aforesaid.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs demand relief as follows:

(i) Damages in an amount to be determined at trial;

(ii) An award in the amount of the legal fees incurred to date by GAM for all amounts spent defending against Defendants' lawsuit currently pending in Illinois state court and for this lawsuit to date and going forward;

(iii) A declaration requiring and an order compelling Defendants to advance expenses incurred by GAM and to indemnify GAM consistent with their contractual obligations;

(iv) An order granting specific performance and compelling Defendants to advance funds to GAM and to indemnify GAM consistent with their contractual obligations;

(v) Attorney's fees and costs of suit; and,

(vi) Such other and further relief as the Court may deem just and appropriate.

Dated:   New York, New York
         February 13, 2015

_____
Sean F. O'Shea
Michael E. Petrella
**O'SHEA PARTNERS LLP**
521 Fifth Avenue, 25th Floor
New York, New York 10175
Tel:   (212) 682-4426
Fax:   (212) 682-4437